## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

ASHLEY GREMMINGER,                          :
                                            :
                        Plaintiff,          :
                                            :          Civ. Action No. 14-3626 (FLW)
v.                                          :
                                            :
UNITED STATES OF AMERICA,                   :                    **OPINION**
et al.,                                     :
                                            :
                        Defendants.         :

---

**WOLFSON, United States District Judge**:

Plaintiff Ashley Gremminger ("Plaintiff") filed this action under the Federal Tort Claims Act ("FTCA") against Defendant United States of America and Monmouth Family Health Center[1] ("MFHC"), (collectively, the "Government"), alleging that the treatment which she received as a patient at MFHC fell below the applicable standard of care. In lieu of an answer, the Government moves for dismissal arguing that it is completely immune from tort liability, because MFHC is organized exclusively for charitable purposes within the meaning of the New Jersey Charitable Immunity Act ("NJCIA"). Alternatively, the Government moves for partial summary judgment, contending that it is entitled to a $250,000 cap on damages, since MFHC is organized exclusively for "hospital purposes" under the NJCIA. For the reasons set forth below, the Government's Motion to Dismiss based on complete immunity is **DENIED**; however, the Government's Motion for Partial Summary Judgment, limiting damages to $250,000, is **GRANTED**.

---

[1]     In 2009, the United States Department of Human Service, Health Resources and Services Administration deemed MFHC a federally qualified health center ("FQHC"). Defendants' Statement of Material Facts ("Defs.' Statement of Facts"), ¶ 3. By virtue of this status, MFHC is a federal employee of the Government, as discussed *infra*. Therefore, the Government is liable for the alleged torts of MFHC.

**BACKGROUND**

Plaintiff was a patient at MFHC during her pregnancy from July 31, 2009 through March 5, 2010 (the "applicable time period"). Defs' Statement of Facts, ¶ 1. MFHC, located in Long Branch, New Jersey, offers medical services at a discounted rate.[2] Defs' Statement of Facts, ¶ 17 ("MFHC uses a sliding discount policy to determine appropriate patient discounts on the basis of family size and ability to pay according to federal poverty guidelines.").

During the applicable time period, MFHC operated from three separate facilities in Long Branch, each of which offered different health and medical related services comprised of internal medicine, pediatric health care, podiatric health care, obstetrics, gynecology, and dental care. Defs' Statement of Facts, ¶ 10. In addition, MFHC provided its patients with social services, as well as financial and nutritional counseling. Defs' Statement of Facts, ¶ 10. To date, MFHC continues to operate from three separate facilities, in which the aforementioned health and medical services are provided, except for its dental practice, which has been relocated. Defs' Statement of Facts, ¶ 10.

In the instant medical malpractice suit, Plaintiff alleges that the treatment she received from MFHC fell below the applicable standard of care, and resulted in the stillbirth of her child. Defs' Statement of Facts, ¶ 5. Plaintiff and Julio Cezar Rivas, the father of Plaintiff's child, initially filed a Complaint in New Jersey Superior Court, Monmouth County Vicinage, but the matter was subsequently removed to federal court on December 7, 2012, by named defendant MFHC and substituted defendant United States of America. Defs' Statement of Facts, ¶ 5.

Thereafter, the Government filed a motion to dismiss for lack of subject matter jurisdiction based upon the plaintiffs' failure to exhaust their administrative remedies, as mandated by the

---

[2] The record does not indicate whether Plaintiff paid for the medical services she received at MFHC.

FTCA. Defs' Statement of Facts, ¶ 7. On July 30, 2013, the motion to dismiss was granted by the district court, and the matter was remanded to the State Court. Defs' Statement of Facts, ¶ 8. In compliance with her duty to exhaust, Plaintiff alone subsequently filed an administrative claim with the United States Department of Health and Human Services. Defs' Statement of Facts, ¶ 9. That claim, however, was denied. Defs' Statement of Facts, ¶ 9. Subsequently, Plaintiff filed this instant lawsuit on June 6, 2014. Def.s' Statement of Facts, ¶ 9.

Presently before the Court is the Government's Motion to Dismiss, or, in the alternative, Motion for Partial Summary Judgment.[3] The Motion to Dismiss is based on the Government's contention that MFHC is a non-profit corporation "organized exclusively for charitable purposes," thereby entitling the Government to absolute immunity from tort liability under N.J.S.A. § 2A: 53A-7(a). However, should the Court reject this argument, the Government argues alternatively that it is entitled to partial summary judgment, because MFHC was instead "organized exclusively for hospital purposes," under N.J.S.A. § 2A: 53A-8. In that regard, the Government contends that its tort liability is limited by the NJCIA's $250,000 cap on damages. The motion is opposed by Plaintiff.

## DISCUSSION

### I.   Standard of Review

The Government's Motion presents the Court with two questions: (a) whether MFHC is entitled to complete immunity pursuant to the NJCIA; and (b) whether MFHC is alternatively entitled to limited immunity in the form of a $250,000 cap on damages pursuant to the NCJIA. In

---

[3]      Discovery has concluded in this case.

conducting these inquiries, the parties, as a threshold issue, dispute the standard upon which the Court should review the Government's assertion of complete immunity.[4]

The Government contends that the assertion of charitable immunity under the NJCIA is directed to this Court's subject matter jurisdiction. *See* Brief in Support of Defendants' Motion ("Defs.' Supp. Brief"), at 3-7. In that regard, the Government maintains that the burden of establishing subject matter jurisdiction lies with Plaintiff. Defs.' Supp. Brief, at 6. On the other hand, Plaintiff contends that the Government's assertion of immunity is an affirmative defense. Plaintiff's Brief in Opposition to Defendants' Motion ("Pl.'s Opp'n Brief"), at 7-9. Plaintiff argues, therefore, the burden of establishing complete immunity falls on the Government. Pl.'s Opp'n Brief, at 9. Plaintiff's position is not supported by the case law.

A party, such as Plaintiff, that brings a claim under the FTCA must satisfy the threshold requirements of 28 U.S.C. § 1346(b)(1). Section 1346(b)(1) includes the following six criteria:

> A claim must be made (1) against the United States, (2) for money damages, . . . (3) for injury or loss of property, or personal injury or death (4) caused by the negligent or wrongful act or omission of any employee of the Government (5) while acting within the scope of his office or employment, (6) *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*

---

[4]     As a preliminary manner, Plaintiff contends that the Government should not be permitted to argue that MFHC was organized for both charitable and hospital purposes, within the meaning of the NJCIA. Pl.'s Opp'n Brief, at 5-7. Plaintiff, however, misconstrues the Government's argument. The Government is not claiming that MFHC is a "hybrid non-profit institution" comprised of both charitable and hospital purposes; that type of argument was forbidden by the New Jersey Supreme Court in *Kuchera v. Jersey Shore Family Health Center,* 221 N.J. 239, 242 (2015). Rather, the Government is arguing that MFHC is organized for charitable purposes, and thus entitled to complete immunity, or, *alternatively*, it is organized for hospital purposes, and thus entitled to limited liability. The Government is permitted to argue alternative theories of law in this context. *See S.M. v. United States*, No. 13-5702, 2016 U.S. Dist. LEXIS 175692 (D.N.J. Dec. 20, 2016); *Dupont v. United States*, No. 15-3752, 2016 U.S. Dist. LEXIS 81739 (D.N.J. June 23, 2016); *Young v. United States,* 152 F. Supp. 3d 337 (D.N.J. 2015).

*CNA v. United States*, 535 F.3d 132, 141 (3d Cir. 2008) (internal citations and quotations omitted). The Third Circuit has explicitly found that § 1346(b)(1)'s threshold requirements are jurisdictional, and that the failure to satisfy any one of them will preclude a district court from resolving a plaintiff's FTCA claim under the principles of sovereign immunity. *CNA*, 535 F.3d at 144 (internal citations omitted). In that respect, a district court's review must be in accordance with Fed. R. Civ. P 12(b)(1), in evaluating "whether a plaintiff's claim has met [§ 1346(b)(1)'s] six conditions." *Id.* at 145.

Here, the Government's assertion of immunity derives from the NJCIA. That statute affords charitable hospitals complete immunity from tort claims. Thus, because the NJCIA is the "law of the place" where MFHC's conduct occurred, the Government's dispute centers on Plaintiff's obligation to satisfy the sixth criteria of § 1346(b)(1). Accordingly, in determining whether the Government is immune from liability pursuant to the NJCIA, the Court must apply the Rule 12(b)(1) standard, which is jurisdictional in nature.[5] In that connection, Plaintiff bears the burden of establishing subject matter jurisdiction over her FTCA claim. However, the Government's alternative argument, wherein the Government maintains that it is entitled to a cap on damages, does not raise any jurisdictional issues since the cap does not absolve the Government of liability. Thus, the Court will apply the standard of Rule 56 to the cap on damages argument. *Young*, 152 F. Supp. at 343  (applying Rule 12(b)(1) in determining whether the Government was

---

[5]     The Court acknowledges that an inquiry as to whether the conditions of § 1346(b)(1) have been met involves "overlapping issues of proof," in that the Court is presented with a "jurisdictional issue that is intertwined with the merits of a[n FTCA] claim." *CNA*, 535 F.3d at 143-44. Therefore, the Court will afford Plaintiff the procedural safeguards of Rule 12(b)(6), *i.e.,* assuming the truth of a plaintiff's allegations, by demanding "'less in the way of jurisdictional proof than would be appropriate at a trial stage.'" *CNA*, 535 F.3d at 144 (internal citations and quotations omitted).

completely immune from tort liability, but applying Rule 56 in determining whether the NCJIA's $250,000 cap was applicable); *S.M.*, 2016 U.S. Dist. LEXIS 175692; *Dupont*, 2016 U.S. Dist. LEXIS 81739.

**a.**  **Rule 12(b)(1)**

A defendant may move to dismiss a claim for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Once a 12(b)(1) challenge is raised, the plaintiff bears the burden of demonstrating the existence of subject matter jurisdiction. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). A Rule 12(b)(1) motion to dismiss is treated as either a "facial or factual challenge to the court's subject matter jurisdiction." *Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Under a facial attack, the movant challenges the legal sufficiency of the claim, and the court considers only "the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Id.* Under a factual attack, however, "the challenge is to the actual alleged jurisdictional facts." *Id.* "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

**b.**  **Rule 56**

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010) ("Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving

party is entitled to judgment as a matter of law."). "An issue of material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 545 (3d Cir. 2012). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party moving for summary judgment must "identify[]each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). To carry its burden of production, the moving party must "show[] that there is no genuine dispute as to any material fact." *Id*. If the movant "fail[s] to show the absence of any disputed material fact . . . , the District Court err[s] in granting summary judgment." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 148 (1970). If the moving party has met its initial burden, then the nonmoving party must "set out specific facts showing a genuine issue for trial." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)). "[W]hen determining whether the moving party has proven the absence of a genuine material issue of fact, the facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true, and the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Aman v. Cort Furniture Rental Corp.*, 85 F. 3d 1074, 1080-81 (3d Cir. 1996) (citations and internal quotation marks omitted).

## II.     The NCJIA

The Government seeks to invoke the immunity provisions of the NJCIA, and, in doing so, the Government mounts a factual attack on the Court's jurisdiction. In enacting the NCJIA, the New Jersey state legislature sought to "protect against the diversion of charitable funds from the

purpose for which they were donated, to encourage private philanthropic activity to ensure the continued provision of services that benefit the general welfare, and to relieve the government of the burden of providing those services." *S.M.*, 2016 U.S. Dist. LEXIS 175692, at *6-7 (citing *Ryan v. Holy Trinity Evangelical Church*, 815 A.2d 419, 425-26 (2003)). In achieving this goal, the NJCIA prevents a party from asserting a negligence claim against a non-profit corporation organized exclusively for religious, charitable, or educational purposes. Specifically, the NJCIA provides, in pertinent part:

> No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

N.J.S.A. 2A:53A-7(a). Simply stated, the NJCIA shields an entity from tort liability "when it (1) was formed as a nonprofit corporation, society, or association; (2) is organized exclusively for religious, charitable, or educational purposes; and (3) was advancing those purposes 'at the time of the injury to plaintiff who was then a beneficiary of the charitable works.'" *S.M.*, 2016 U.S. Dist. LEXIS 175692, at *8 (quoting *Bieker v. Cmty. House of Moorestown*, 777 A.2d 37, 42 (2001)).

"Although the overarching character of all three categories [of N.J.S.A 2A:53A-7(a)] is eleemosynary, they are actually quite distinct." *Ryan*, 815 A.2d at 424-25. For instance, the "religious" and "educational" categories under the NJCIA "have a limited and commonly understood meaning." *Id.* The "charitable" category, on the other hand, "is a more complex notion

that defies precise definition." *Id*. Therefore, whenever an entity asserts the charitable defense, "the court must conduct a factual analysis beyond the benevolent acts" of that entity. *S.M.,* 2016 U.S. Dist. LEXIS 175692, at *9 (citing *Parker v. St. Stephen's Urban Dev. Corp.*, 579 A.2d 360, 364 (App. Div. 1990)). Specifically, in conducting this analysis, courts "have looked to an organization's funding, charter, daily operations, relationships to other entities, and the extent to which an organization lessens a burden on the government." *Nazzaro v. United States*, 304 F. Supp. 2d 605, 611 (D.N.J. 2004).

In addition, the NJCIA protects non-profit entities that are exclusively organized for "hospital purposes." N.J.S.A. 2A: 53A-8. In that regard, the NJCIA limits their tort liability in the form of a $250,000 cap on damages:

> Notwithstanding the provisions of [N.J.S.A. 2A:53A-7], any nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $250,000, together with interest and costs of such suit[.]

N.J.S.A. 2A:53A-8. Therefore, the plain language of N.J.S.A. 2A:53A-7 and -8 limits an entity's liability under the NJCIA where the entity: "[1] is formed as a nonprofit corporation . . . , [2] is organized exclusively for hospital purposes, [3] was promoting those objectives and purposes at the time the plaintiff was injured, and [4] the plaintiff was a beneficiary of the activities of the hospital." *Kuchera*, 221 N.J. at 249 (internal citation omitted).

"The most prominent distinction between nonprofit entities organized exclusively for charitable, religious, or educational purposes and nonprofits organized exclusively for hospital purposes is that the former are immune from liability while the latter are subject to liability for negligence, albeit with a cap on its damages." *Kuchera*, 221 N.J at 247. Stated differently, "if a nonprofit is organized 'exclusively for hospital purposes,' then no absolute immunity can apply."

*Young*, 152 F. Supp. 3d at 347. Accordingly, if the Court finds that MFHC "is organized exclusively for hospital purposes, then the jurisdictional inquiry is concluded, even without determining the charitable status of" MFHC. *Id.*

On this motion, the parties primarily dispute two issues: (1) whether the Government may claim state law immunity under the NJCIA; and, in that connection, (2) whether MFHC has satisfied the third element of both N.J.S.A. § 2A:53A-7 and -8,[6] or, put differently, whether MFHC is organized for either a "hospital purpose" or a "charitable purpose" as defined by the NJCIA. In making this particular determination, the Court notes that the analysis with regard to whether MFHC is organized for a charitable or hospitable purpose overlaps. The Court will turn to each of these disputes.

### a.      The Government May Assert a Defense Under the NJCIA

Citing *Lomando v. United States*, 667 F.3d 363 (3rd Cir. 2011), Plaintiff argues that the defense of charitable immunity is not available to the Government, because MFHC does not

---

[6]      Plaintiff also briefly challenges MFHC's "non-profit" status on the basis that it charges for its services and distributes bonuses to its employees. Pl.'s Opp'n, at 9-12. The Court need not inquire into MFHC's non-profit status, however, since the Internal Revenue Service has already "determined that MFHC [is] exempt from Federal income tax . . . and classified MFHC as a public charity . . . ." Defs.' Statement of Facts, ¶ 37; *See Young v. United States*, 190 F. Supp. 3d 378, 384-85. ("The Court begins and ends its analysis with the fact that [the defendant FQHC] is organized as a nonprofit corporation and has been granted nonprofit status by the Internal Revenue Service . . . ."). In any event, the Court finds that MFHC's practices with respect to patient billing and compensation do not transform it into a for-profit entity. *Graber v. Richard Stockton College of New Jersey*, 313 N.J. Super. 476, 482 (App. Div. 1998) (holding that a non-profit's status is not jeopardized "merely because it charges money for its services . . . unless it makes a profit or collects fees for services totally unrelated to its organizational pursuits") (internal citations omitted); *Paper Mill Playhouse v. Millburn Township*, 95 N.J. 503, 522 (1984) (stating that "as long as salaries are not excessive, the mere payment of them is not sufficient grounds for denying" non-profit status) (internal citations omitted). Plaintiff has not produced any evidence that MFHC makes a profit or that it pays excessive salaries. Thus, the Court has no basis to find that MFHC is not a nonprofit organization.

provide free health services and it is not staffed by volunteer physicians. Pl.'s Opp'n Brief, at 3-5 ("[T]he entire predicate of the Court's decision in *Lomando* was that the target defendant entity . . . was a free clinic and the target defendant-physicians were all volunteers.). The Court finds this argument without merit, as Plaintiff misconstrues the Third Circuit's holding in *Lomando*.

In *Lomando*, the plaintiff brought a medical malpractice action against the government under the FTCA, for the treatment that her daughter received at the Parker Family Health Center ("Parker Health"). *Id*. at 368. Parker Health offered free medical services, and its health care providers were volunteer physicians who were deemed government employees of the Public Health Service ("PHS"). *Id*. Ultimately, the Third Circuit found that the government was entitled to assert the defense of immunity under the NJCIA. *Id*. at 376. However, the Third Circuit did not base this finding upon the fact that Parker Health was a "free" clinic staffed by "volunteer" physicians. Rather, the Third Circuit simply stated that the FTCA permits the government, as the employer, to "assert any . . . defenses to which [it] is entitled," and interpreted this principle to include "any defenses available to a similarly-placed private employer answering for the alleged torts of its employee." *Id.* at 376. Accordingly, the court rejects Plaintiff's overly narrow interpretation of the *Lomando* decision.

In the instant matter, the Government is responsible for the conduct of MFHC, because MFHC is deemed to be an employee of the PHS. *See* 28 U.S.C. §§ 1346(b), 261-80; *Lomando*, 667 F.3d at 371-72 ("[A]n action against the United States under the FTCA is the exclusive remedy for persons alleging 'personal injury . . . resulting from the performance of medical . . . functions' by [PHS] employees acting within the scope of their employment.") (internal citations omitted). By that means, the Government, in defending itself from liability, "stands in the shoes" of MFHC, and is entitled to assert any defense that MFHC may assert under federal or state law. *Lomando*,

11

667 F.3d at 369 (citation omitted). Because immunity under the NJCIA is a defense that is available to MFHC under New Jersey law, the Court finds that it may be asserted by the Government in this action. *See Dupont*, 2016 U.S. Dist. Lexis 81739, at *11 ("The Court therefore rejects Plaintiff's argument that state law immunities that are available to [defendant non-profit] should not be made available to the United States under the FTCA.").

      **b.**      **Liability under the NJCIA**

Pursuant to the NJCIA, the Government first argues that it is completely immune from tort liability, because MFHC is a "private, non-profit entity organized exclusively for charitable purposes." Defs.' Supp. Brief, at 13. Specifically, the Government argues that MFHC is entitled to "charitable" status, because it: (1) receives contributions from private entities; (2) provides medical services, regardless of a patient's insurance status or ability to pay; and (3) its corporate documents, *i.e.*, Bylaws and Certificate of Incorporation, demonstrate a charitable purpose. Defs.' Supp. Brief, at 16-32.

In support of its first argument, the Government identifies two private contributions that MFHC received during the applicable time period from the Monmouth Medical Center ("MMC"), a licensed hospital within the State of New Jersey, and the Horizon Foundation. Defs.' Supp. Brief, at 28-29. The Court, however, is unpersuaded by this argument, as the majority of MFHC's revenue is derived from the private market and federal grants.

In enacting the NJCIA, Congress sought to restore the purpose and policy underlying common-law immunity. *Abdallah v. Occupational Center of Hudson County, Inc.*, 351 N.J. Super. 280, 285 (App. Div. 2002). Specifically, the purpose and policy of charitable immunity "was to avoid diverting charitable trust funds to non-charitable purposes in order to live up to the reasonable expectations of the benefactor." *Id.* (citation omitted); *Parker*, 243 N.J. Super. at 326

("[T]the essence of the public policy favoring charitable immunity is the preservation of private charitable contributions for their designated purposes."); *Winters v. Jersey City*, 120 N.J. Super. 129, 144-45 (App. Div. 1972) ("The reasons for cloaking private charities with immunity [are] mainly to protect the trust funds of such charities from serious dissipation . . . and to avoid diversion of their benefactors' contributions from the purpose for which they were made."). Thus, while the traditional analysis of an entity's status under the NJCIA requires a fact-sensitive inquiry, it "must take into account the organization's source of funds as a *critical* element of charitable status." *Abdallah*, 351 N.J. Super. at 284 (emphasis added). Indeed, an "essential characteristic" of a non-profit corporation is the receipt of "a *substantial* amount of charitable contributions." *Morales by Martinez v. New Jersey Academy of Aquatic Sciences*, 694 A.2d 600, 602-03 (App. Div. 1997) (emphasis added).

In light of these principles, MFHC's funding does not resemble that of a private, non-profit entity organized exclusively for charitable purposes. First, Libert Amato, the CFO of MFHC, expressly conceded that the majority of MFHC's funding is derived from federal grants and the private market, not charitable contributions:

> Q:     Okay. If you know, if you remember, what percentage of the operating—what percentage of the overall funding of the clinic was derived from the federal government in or around 2009, 2010, in those years?
> A:     About 10 percent
> . . .
> Q:     So approximately 10 percent was outright grant money from the federal government?
> A:     That's correct.
> Q:     And what percentage of patient—what percentage of the funding was derived from patient billing during 2009, 2010?
> A:     Most of the difference, well, we had the $400,000 grant from the hospital.
> Q:     Right
> A:     And in addition to that, some small, little grants. The rest is, you know, patient billing, all patient billing revenues are probably another 75 percent or so.

Amato Dep., T23:22 – T24:23. Accordingly, as testified by Mr. Amato, approximately 85% of MFHC's funding structure is a mixture of government funding and patient billing for services provided. Indeed, Mr. Amato's testimony is also consistent with MFHC's audited financial statements. Although the statements are not entirely self-explanatory, the financial statements indicate that MFHC's total net revenue during the applicable time period totaled $8,602,749. Of that amount, patient service revenue generated $6,502,927 (75.6% of total revenue), and the federal grant totaled $679,991 (7.9% of total revenue).[7] Accordingly, during the applicable time period, MFHC's funding was predominately generated from non-charitable sources.

The Government, nonetheless, contends that an entity's reliance on funding given by the government and private market does not preclude a finding of immunity pursuant to the NJCIA, citing *Nazzaro* and similar lines of cases.[8] The plaintiff, in *Nazzaro*, brought a tort claim pursuant to the FTCA, and the government, there, similarly asserted that it was immune from liability under the NJCIA. *See Nazzaro*, 204 F. Supp. at 608. The court agreed with the government, and held that the defendant entity was "charitable" within the meaning of the NJCIA, despite the fact that it

---

[7]     For the year ending 2010, MFHC has also received governmental grants from the state of New Jersey. Declaration of Marta Silverberg (dated April 7, 2016) ("Silverberg Dec."), Silverberg Dec. ¶ 41, Ex. 13.

[8]     Specifically, in arguing for immunity, the government also cites *Morales by Martinez v. New Jersey Academy of Aquatic Sciences*, 694 A.2d 600 (App. Div. 1997) and *Pelaez v. Rugby Laboratories, Inc.*, 264 N.J. Super. 450 (Law Div. 1993), two cases in which the state court examined financial statements belonging to the defendant non-profit. Although the defendant entities, there, were "charitable," despite the receipt of federal funds, they also solicited a substantial amount in private contributions and/or engaged in fund-raising activities. *Morales*, 694 A.2d at 602-03 ("Most significantly, the [defendant] receives a substantial amount of charitable contributions, which is one of the essential characteristics of a non-profit corporation entitled to charitable immunity."); *Pelaez*, 264 N.J. Super. at 457 ("[Defendant] actively seeks private contributions and derives a substantial amount of income from private contributions."). Therefore, the defendant entities, in those cases, are distinguishable from MFHC, as further discussed *infra*.

received federal grants. *Id*. at 615. Importantly, the court noted that, in addition to its reliance on federal funding, the defendant entity received a substantial amount in charitable contributions, *i.e.,* 25%, and, significantly, it "actively [sought] out charitable contributions." *Id*.

In contrast to the defendant entity in *Nazzaro*, MFHC received little private contributions during the applicable time period. As noted, the Government only references two private grants from MMC[9] and the Horizon Foundation, in the amount of $400,000 and $66,000, respectively[10] Defs.' Supp. Brief, at 28-29. Clearly, this amount, which only accounts for 5.4% of MFHC's total revenue for the year ending 2010, is insufficient for MFHC to claim that it is organized exclusively for charitable purposes. *See Morales*, 694 A.2d at 602 n.1 (deeming charitable status upon a defendant non-profit that received donations comprising 40% of its total revenue); *Pelaez*, 264 N.J. Super. at 457 (deeming charitable status upon a defendant non-profit that received donations comprising 33.1% percent of its total revenue, over the course of two years).

More compellingly, Mr. Amato has also conceded that MFHC neither actively solicits charitable contributions, nor has it held any charitable fundraising events in support of its medical operations:

---

[9] The Court notes that MFHC and MMC have entered into an agreement in which MFHC "has made its facilities available to Monmouth Medical Center for Monmouth Medical Center's resident training program," so that MMC's residents may obtain clinical training and experience at MFHC. Silverberg Dec., ¶23, Ex. 7.

[10] In arguing that MFHC's private contributions are significant, the Government also references a grant from Delta Dental and an in-kind contribution of vaccines allegedly worth $107,201. Defs.' Supp. Brief, at 29. However, the Government does not indicate the amount of the grant given by Delta Dental, and the Court cannot discern that amount from MFHC's financial statements. Additionally, the Government fails to address whether in-kind contributions should be considered in an analysis of a non-profit's funding structure in this context; in any event, the donation of vaccines was not received during the applicable time period. Indeed, the donation appears on MFHC's 2011 tax return for the period April 1, 2010 to March 31, 2011, but Plaintiff stopped her treatment at MFHC on March, 5, 2010. Therefore, neither the Delta Dental grant nor the in-kind contribution of vaccines will be considered here.

Q:      Were there any such events [charity balls] published for the benefit of the clinic during your tenure here as CFO?

A:      No.

Q:      There were no such events at all?

A:      None that I can recall

Q:      What about any other fundraising events like radiothons, Chinese auctions, whatever, bingo night, Monte Carlo night, anything of the sort?

A:      None.

Q:      None at all?

A:      None at all.

. . .

Q:      Okay. And is it fair to say that when you were here as CFO . . . there were absolutely no fundraising activities seeking charitable donations from members of the public for the benefit of the clinic and its patients, is that true?

A:      Yes, that's true.

Amato Dep., T34:22 – T35:17. Therefore, *Nazzaro* is distinguishable, because, unlike the entity there, MFHC did not receive a significant amount in private contributions, nor did it engage in any fundraising efforts, during the applicable time period. Accordingly, the Court cannot find that MFHC's funding structure demonstrates that it is organized for charitable purposes.

Nor do the remainder of the Government's arguments support that MFHC is a "charitable" entity. Rather, the Government's contentions with respect to MFHC's billing practices and corporate documents demonstrate that MFHC is organized for "hospital purposes," thereby entitling the Government to the NCJIA's $250,000 cap on damages. In so holding, I start with the New Jersey Supreme Court's decision in *Kuchera* and *Hunterdon Medical Center v. Township of Readington*, 195 N.J. 549 (2008).

In *Kuchera*, the plaintiff suffered a slip and fall while attending a free eye screening at the defendant non-profit's health clinic. *Kuchera*, 221 N.J. at 244-45. The trial court found that the defendant non-profit had "a hybrid purpose that include[d] educational and charitable services as well as the operation of a hospital." *Id*. 245. Because of its charitable component, the trial court held that the defendant was completely immune from tort liability. *Id*. The appellate court affirmed

the trial court's hybrid analysis, noting that the defendant offered an array of services extending beyond those that are ordinarily offered by a hospital. *Id*. The New Jersey Supreme Court, however, reversed the appellate court's decision, reasoning that the lower courts failed to account for "the evolving character of hospitals and healthcare." *Id*. at 251. In so finding, the *Kuchera* Court held that the defendant non-profit was exclusively organized for hospital purposes, despite the various services it provided. *Id*. at 254.

The *Kuchera* Court began its analysis by citing to *Hunterdon*, an earlier opinion in which the Court discussed the meaning of "hospital purpose." *Id*. at 250. Although the issue in *Hunterdon* concerned whether a hospital's offsite facility was exempt from local property taxation, the Court, nonetheless, noted that the discussion there with regard to the "organization and role of a modern hospital is instructive." *Id*. In that connection, the Court referenced the portion of the *Hunterdon* opinion cautioning against adopting a narrow or restrictive definition of the term hospital:

> [T]he definition of a hospital as a twenty-four-hour continuous care operation is overly restrictive for purposes of the analysis. The early hospital tax-exemption cases did not focus on the range of medical activities engaged in by entities actually organized to operate as hospitals . . . . [T]he reference to a hospital's ability to provide twenty-four-hour continuous care to an inpatient population, or to emergency victims, does not incorporate a hospital's larger role as an expected and, to be sure, legitimate, provider of numerous patient services.

*Id*. at 250-51; *Hunterdon Medical Center*, 195 N.J. at 571-72. Relying on *Hunterdon*, the Court stressed that "the analysis for 'hospital purposes' must take into consideration the many medical pursuits permitted to the 'modern' hospital in New Jersey." *Kuchera*, 221 N.J. at 250; *Hunterdon Medical Center,* 195 N.J. at 553.

The principles announced in *Hunterdon* were echoed and expanded upon in the remainder of the analysis in *Kuchera*. For instance, the Court refrained from confining "the term 'hospital purposes' to the vintage conception of a hospital as a facility [merely] providing a site for

physicians to provide acute and continuous inpatient care for their patients." *Id.* at 252. Rather, the Court held that the NJCIA "should be liberally construed to effectuate its purpose" by focusing "on the many medical pursuits of a modern hospital in New Jersey." *Id*. These pursuits, according to the Court, included "comprehensive services beyond acute inpatient care [such as] preventative services, therapy, educational programs, and counseling . . . . " *Id.* at 251-52. In addition to these services, the modern day hospital, as defined by the Court, may also include a teaching component, and provide affordable healthcare to their surrounding communities:

> The education of medical students, physicians, nurses, and other health professionals is a significant core hospital purpose related to the provision of quality health care to patients. The modern hospital in New Jersey also provides medical care to those who can pay for the care and to those who cannot. In fact, every acute care hospital in this State is required to provide care to anyone who seeks care without regard to the ability to pay. N.J.S.A. 26:2H-18.64. The provision of charity care is a core function of a hospital.

*Id*. at 254. The Court, thus, concluded that in determining when the NJCIA's damages cap applies, it is appropriate to "account for the multi-function nature of the modern hospital and its role in the provision of healthcare in this society." *Id*. at 255.

Three other courts within this district, each of which addressed arguments identical to the ones advanced here, have applied the analysis set forth in *Kuchera*. In doing so, those courts all found that the government was not entitled to charitable immunity, but rather, because characteristics of the defendant non-profits, there, were similar to those of the modern hospital, the government is or may be entitled to the damage cap under the NJCIA. *See Young*, 152 F. Supp. 3d at 348-51; *S.M*., 2016 U.S. Dist. LEXIS 175692, at *13-16; *Dupont*, 2016 U.S. Dist. LEXIS 81739, at *26-31.

In *Young*, the plaintiff brought a medical malpractice action against the government, as a result of the treatment that she received by CAMcare. *Young*, 152 F. Supp. at 340. CAMcare, like

MFHC, was a federally qualified health center that offered "a laundry list of . . . medical services" to "underserved families . . . regardless of [their] insurance status or ability to pay" in the City of Camden, New Jersey. *Id*. at 350 (internal quotations omitted). Based on this practice, and the language contained within CAMcare's Certificate of Incorporation, the government argued that CAMcare was organized for "charitable" purposes, thereby entitling it to complete immunity under the NJCIA. *Id*. However, the *Young* court disagreed, and instead found that CAMcare was akin to the modern hospital described in *Kuchera*, particularly because CAMcare offered *affordable* and "*comprehensive* primary health care" services. *Id*. (internal quotations omitted) (emphasis added). As such, the court, there, applied the NJCIA's $250,000 cap on damages. *Id*.

Similarly, in *Dupont*, a medical malpractice action was filed against the United States, as a result of the treatment that the plaintiff's wife received at CAMcare. *Dupont*, 2016 U.S. Dist. LEXIS 81739, at *1. The government also claimed that it was completely immune from liability, because CAMcare was a "charitable" entity. *Id*. at *19. In determining CAMcare's status, the court held that "CAMcare is [not] unique from the typical modern hospital described in *Kuchera*," *id* at *22*, as CAMcare offered various medical services, regardless of whether a patient could afford them. *Id*. Because the action was still in the early stages of litigation, however, the court did not rule on CAMcare's status; rather, the court noted that "the law and record . . . strongly support" that CAMcare qualifies as a non-profit hospital under the NJCIA. *Id*. at *27.

Lastly, in *S.M.*, the plaintiff filed an FTCA claim against the United States, because the CompleteCare Health Network ("CompleteCare") allegedly provided her with treatment that fell below the applicable standard of care. *S.M.*, 2016 U.S. Dist. LEXIS, at *2. As in the cases cited above, CompleteCare was a federally qualified health center that offered an array of medical services such as affordable primary care, on-site specialty care, and preventative care. *Id*.

Additionally, CompleteCare offered various health/financial counseling programs, and trained/supervised residents of South Jersey Hospital. *Id*. at *14 Although the government argued for complete immunity, claiming that CompleteCare was organized for charitable purposes, the court disagreed, and instead held that the government was entitled to limited immunity under the NJCIA. *Id*. *13-15. In finding that CompleteCare was a modern hospital, the court underscored the variety of medical and health related services that CompleteCare provided, and the fact that CompleteCare's operations include a teaching component. *Id*.

Based on the New Jersey Supreme Court's guidance, and persuasive district court decisions, I find that MFHC is organized for "hospital purposes" within the meaning of the NJCIA, as it shares many characteristics with the non-profit entities described in the above cases.[11] First, the Court acknowledges that MFHC provides some free medical services for indigent patients. Defs.' Supp. Brief, at 20-22, 25-32. According to the Government, this type of practice entitles MFHC to charitable status. However, this billing practice is not confined to non-profit medical entities that are charitable under the NJCIA. *See* N.J.S.A. 26:2H-18.64 ("No hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment"). Rather, in *Kuchera*, the New Jersey Supreme Court held that "[t]he provision of charity care is a core function of a [modern] hospital." *Kuchera*, 221 N.J. at 254. Therefore, this type of billing practice, under which some free medical services are provided, is not sufficient to

---

[11] Plaintiff argues that partial summary judgment is not appropriate because of Mr. Amato's deposition testimony, in which he stated: "[MFHC is] a clinic . . . . Because a hospital is totally different. A clinic is similar to a doctor's office. People come in for a visit, whether it's a well-care visit or whether they have some kind of a medical problem." Amato Dep., T51:7-12. However, this argument is unpersuasive. For one, the Court acknowledges that MFHC is not a traditional acute care hospital; rather, it operates as a modern hospital that provides numerous patient services, similar to those described in *Kuchera*. More importantly, Mr. Amato's lay opinion in this regard is not dispositive of whether MFHC is legally organized for "hospital purposes" pursuant to the NJCIA.

transform a medical facility that is otherwise organized for "hospital purposes" into a charitable entity within the meaning of the NJCIA.

In the instant matter, the record demonstrates that MFHC provides medical care to both patients who can and cannot afford care. Indeed, MFHC caters to the medical needs of the poor in Long Branch and its surrounding communities; for instance, MFHC enters into payment plans with its patients, 34% of whom are uninsured, for the services it provides based upon ability to pay. Silverberg Dec., ¶¶ 14-15. However, if a patient is unable to afford medical services, even at a discounted rate, MFHC will not decline to provide services as "[n]o patient is ever turned away because of an inability to pay." Silverberg Dec., ¶ 13. MFHC does not "refer unpaid patient accounts to a collection agency or file suit to collect unpaid accounts from patients," which only totaled $30,139 for the year ending 2010. Silverberg Dec., ¶¶ 15, 42. But this practice, *i.e.*, providing some patients with free treatment or at a discounted rate, while charging other patients, reflects that MFHC provides medical services consistent with a "modern hospital" in New Jersey. *See Kuchera*, 221 N.J. at 254.

Second MHFC's Bylaws and Certificate of Incorporation also illustrate that MFHC is organized for "hospital purposes." Indeed, MFHC's corporate documents demonstrate that MFHC, like a modern hospital, provides its patients with an array of medical, counseling, and educational services, beyond 24-hour inpatient care. *Id*. at 251 (stating that the modern hospital provides "preventative services, therapy, educational programs, and counseling . . . . ").

Specifically, MFHC's Bylaws, which demonstrate the purpose for which MFHC was formed, state, in relevant part:

Section 3. Mission and Purpose

The mission of the Monmouth Family Heath Center is to provide high quality, comprehensive, affordable, culturally sensitive and linguistically appropriate

> primary and preventative health care services to the residents of Long Brach and surrounding communities.
>
> . . .
>
> The purposes for which the Corporation is formed are . . . : (a) To establish and operate indefinitely a health center or centers, and to render primary and ancillary health care and treatment services to individuals who are in need of such services[.]

Silverberg Dec., ¶ 11, Ex. 4. Similarly, MFHC's 2009 and 2010 tax returns also describe its "mission" as follows: "To provide a broad range of health services to a largely medically under served population in Monmouth County, New Jersey." Silverberg Dec., ¶ 36, Ex. 9-10. During the applicable time period, this care was administered through three of MFHC's facilitates, located throughout Long Branch, New Jersey, and included various medical services, such as internal medicine, pediatric health care, podiatric health care, obstetrics, gynecology, and dental care. Silverberg Dec., ¶ 6. To enhance favorable patient outcomes, and further serve its community, MFHC similarly provided a variety of social services relating to financial counseling, as well as health-related nutritional counseling. Silverberg Dec., ¶ 6. Significantly, those medical and health-related services provided by MFHC are not disputed by Plaintiff; therefore, the Court finds that the "multi-function nature" of MFHC is consistent with the modern day hospital. *Kuchera*, 221 N.J. at 255; *S.M.*, 2016 U.S. Dist. LEXIS 175692, at *13 (the defendant FQHC's operations reflected those of a hospital, because it offered medical serves related to primary care, on-site specialty care, and preventative care, as well as various counseling services); *Dupont*, 2016 U.S. Dist. LEXIS 81739, at *21 (the defendant health center, whose services included "primary care, preventive care and 'related support and enabling health services'" was entitled to the NJCIA's $250,000 cap on damages); *Young*, 152 F. Supp. at 350 (the defendant FQHC was organized for a hospital purpose, as it offered a "laundry list of . . . medical services provided by the modern day hospital.").

Finally, MFHC is the paradigm of a modern hospital, because it makes its medical facilities available for, and assists in the administration of, MMC's resident training program. *Kuchera,* 221 N.J. at 254 ("The education of medical students, physicians, nurses, and other health professionals is a significant core hospital purpose related to the provision of quality health care to patients.").

The Clinical Affiliation Agreement ("Agreement"), which governs the MMC and MFHC relationship in this regard, states: "MMC has established a resident training program and desires that its residents ("Residents") obtain necessary clinical training and experience at MFHC[.]" Silverberg Dec., ¶ 23, Ex. 7. Pursuant to this Agreement, "MFHC shall attempt to make available experiences, consistent with MFHC schedules and the requirements and rights of MFHC patients, that will enable Residents to meet the objectives of the Program." Silverberg Dec., ¶ 23, Ex. 7. In addition, the Agreement requires that "MFHC . . . designate a Coordinator who shall plan assignments for the Residents and who shall, in cooperation with MMC's Program Director, implement the Program." Silverberg Dec., ¶ 23, Ex. 7. Therefore, like a modern hospital, MFHC's operations also includes a teaching component. *S.M.*, 2016 U.S. Dist. LEXIS 175692, at *14 (noting that the defendant FQHC "trains and supervises medical residents."). Based on these undisputed facts, the Court holds that MFHC is organized for "hospital purposes" under the NJCIA, and, correspondingly, MFHC is not entitled to charitable immunity. *See Kuchera*, 221 N.J. at 255 (refusing to find that an entity can have a hybrid purpose, under which it is organized for both charitable and hospital purposes).

Despite MFHC's core hospital components, however, Plaintiff argues that MFHC is not entitled to the NCJIA's $250,000 cap on damages, because: (1) MFHC is not a twenty-four hour

23

continuous care facility; and (2) MFHC is not an off-site extension or satellite of an established hospital. Pl.'s Opp'n Brief, at 31-33. The Court is not persuaded by Plaintiff's arguments.[12]

First, in *Hunterdon*, the New Jersey Supreme Court rejected Plaintiff's first argument with regard to MFHC's hours of operation; indeed, a non-profit provider of medical services is not required to provide twenty-four hour continuous care, in order to be organized for hospital purposes under the NJCIA. *Hunterdon Medical Center*, 195 N.J. at 571 ("[W]e hold that the definition of a hospital as a twenty-four-hour continuous care operation is *overly restrictive* for purposes of the analysis.") (emphasis added).

Similarly, Plaintiff's second argument is overly restrictive, since a non-profit provider of health care services need not be affiliated with an established hospital in order to claim the NCJIA's $250,000 cap on damages. *Young*, 152 F. Supp. at 351 ("The [NJCIA] itself does not require being owned or operated by a hospital."). Moreover, in *Kuchera*, the New Jersey Supreme Court stated that the NJCIA "should be liberally construed [by] focus[ing] on the many medical pursuits of a modern hospital in New Jersey." *Kuchera*, 221 N.J. at 252. Requiring MFHC to be affiliated with a hospital in applying the damages cap would be in conflict with the New Jersey Supreme Court's definition of a modern hospital. *Young*, 152 F. Supp. at 350-51 ("[The plaintiffs] oppose applying the damages cap to [the defendant] on the basis that [it] is not a hospital, nor is it

---

[12]     Plaintiff also argues that MFHC is not entitled to the damage cap because it "does not fit within any definition of hospital," as contained in N.J.A.C. 10:52-1.2 and 8:43G-1, both of which require twenty-four hour nursing care. Pl.'s Opp'n, at 35-38. However, this approach, in which a court declines to apply the NJCIA, because a non-profit provider of health services is not a hospital within the meaning of various "definitional sources," has been rejected in *Hunterdon*, 195 N.J. at 571-72. ("To meet its immediate case needs, the [lower court] resorted to definitional sources to find the distinguishing feature or features of a 'hospital.' Such generalized definitions . . . do[] not incorporate a hospital's larger role as an expected and, to be sure, legitimate, provider of numerous patient services."). Therefore, the NJCIA's cap on damages is not contingent upon whether MFHC meets the definition of hospital as contained within N.J.A.C. 10:52-1.2 and 8:43G-1.

owned or operated by a hospital . . . . This argument is without merit and has no basis in the case law cited by [the plaintiffs].").[13]

## CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss is **DENIED**. However, the Government's Motion for Partial Summary Judgment with respect to the NJCIA's $250,000 cap on damages is **GRANTED**.

Dated: March 29, 2017

                                        /s/ Freda L. Wolfson
                                        Freda L. Wolfson
                                        United States District Judge

---

[13] The Government briefly discusses MFHC's Board of Directors, and notes that the members are not compensated for their services. Relying on that fact, the Government suggests that this structure also shows that MFHC is organized for "charitable purposes." Defs.' Supp. Brief, at 23-24. The Government, however, has not cited any authority showing this type of structure is a factor to consider under the NJCIA immunity analysis. Nevertheless, even if the Court were to consider this here, it would not alter the Court's conclusion that MFHC is organized for "hospital purposes," pursuant to the analysis set forth by the New Jersey Supreme Court.